[Cite as *State ex rel. Am. Subcontractors Assn., Inc. v. Ohio State Univ.,* 129 Ohio St.3d 111, 2011-Ohio-2881.]

THE STATE EX REL. AMERICAN SUBCONTRACTORS ASSOCIATION, INC. ET AL. *v.* OHIO STATE UNIVERSITY.

[Cite as *State ex rel. Am. Subcontractors Assn., Inc. v. Ohio State Univ.,*

129 Ohio St.3d 111, 2011-Ohio-2881.]

*Public construction contracts — Bond of contractor — R.C. 153.54 and Section 8 of 2009 Sub.H.B. No. 318.*

(No. 2010-2059 — Submitted May 10, 2011 — Decided June 21, 2011.)

IN MANDAMUS.

_____

**Per Curiam.**

{¶ 1}  This is an original action for a writ of mandamus to compel respondent, Ohio State University, to require that a bond be furnished by Turner Construction Company as construction manager at risk for a construction project. Because relators are not entitled to the requested extraordinary relief, we deny the writ.

**Facts**

{¶ 2}  In 2005, Ohio State began work on a $1 billion expansion of its Medical Center, which has been referred to as "ProjectOne."  In February 2009, Ohio State entered into an agreement for construction-management services with Turner on the project.  Construction work on the project began in the fall of 2009 and is scheduled to be completed in 2014.

{¶ 3}  Under the usual construction method, public institutions of higher education like Ohio State would be required to employ multiple prime contractors for constructing, renovating, or improving capital facilities.  That method would require Ohio State to first engage a company to design the project and then seek bids from contractors to do the construction and would prohibit having one prime

contractor holding all trade contracts for a project. It is alleged that the multiple-prime-contractor system has resulted in delays and increased costs.

{¶ 4} In December 2009, the General Assembly enacted Section 8 of Sub.H.B. No. 318 ("H.B. 318"), a temporary uncodified law that directed the chancellor of the Ohio Board of Regents to designate during 2010 one construction project at each of three different state institutions of higher education as a Construction Reform Demonstration Project. The purpose of the law was to test alternative methods of securing public construction projects to determine whether they would afford greater flexibility in increasing efficiency and lowering costs.

{¶ 5} Pursuant to H.B. 318, Ohio State requested that the Ohio Board of Regents designate certain core phases of the overall project as a Construction Reform Demonstration Project. On March 24, 2010, the chancellor designated portions of the project as a Construction Reform Demonstration Project, and on April 5, 2010, the Ohio Controlling Board approved the designation. The core phases of the project encompassed in the designation are (1) constructing a new cancer and critical-care tower, (2) relocating and upgrading infrastructure and roadways, (3) upgrading current space in existing Medical Center facilities, (4) landscaping and urban planning, (5) demolishing Cramblett Hall, and (6) constructing a chiller plant, with the estimated cost of these phases being $658.3 million.

{¶ 6} One of the specified alternative methods of construction delivery authorized by Section 8 of H.B. 318 is designated "construction manager at risk." On July 8, 2010, Ohio State entered into a construction-manager-at-risk agreement with Turner for the project. Ohio State selected Turner to serve as construction manager at risk through a qualifications-based selection process. This process differed from traditional competitive bidding, which requires selection of a contractor based on the lowest responsive and responsible bidder.

**{¶ 7}** Ohio State did not require Turner to furnish a surety bond to secure the performance of Turner and its subcontractors. Requiring Turner to provide a bond would have increased the cost of the project by as much as $11.9 million. Instead, under the agreement, Turner provided to Ohio State a $20,000,000 irrevocable standby letter of credit. Turner also purchased subcontractor-default insurance to protect Turner against default by the subcontractors performing the construction. Turner has entered into subcontracts for performance of some of the work on the project. As of February 2011, Turner and its subcontractors had entered into 47 subcontracts with 43 subcontractors, and Turner had paid out $5 million, with all payments made within five days of payment to Turner, as required by the contract.

**{¶ 8}** Relators American Subcontractors Association ("ASA") and American Subcontractors Association of Ohio, Inc. ("ASA-Ohio") are trade associations of suppliers who work primarily as subcontractors on construction projects. Their purpose is to protect and advance the interests of subcontractors and suppliers, including those in Ohio. Relator Surety and Fidelity Association of America ("SFAA") is a national trade association of companies licensed to write fidelity and surety bonds and comprises 451 members, including 33 members with their principal places of business in Ohio. SFAA's purpose is to protect and advance the interests of sureties in the nation and in Ohio.

**{¶ 9}** On November 30, 2010, relators filed this action for a writ of mandamus to compel Ohio State to require that Turner furnish a bond as construction manager at risk. After Ohio State filed an answer, we granted an alternative writ. 127 Ohio St.3d 1530, 2011-Ohio-376, 940 N.E.2d 984. The parties submitted briefs and evidence.

**{¶ 10}** This cause is now before the court for our consideration of relators' mandamus claim.

**Legal Analysis**

*Standing*

**{¶ 11}** Ohio State asserts that relators lack standing to institute this mandamus action. "A preliminary inquiry in all legal claims is the issue of standing." *Cuyahoga Cty. Bd. of Commrs. v. State*, 112 Ohio St.3d 59, 2006-Ohio-6499, 858 N.E.2d 330, ¶ 22. "Before an Ohio court can consider the merits of a legal claim, the person or entity seeking relief must establish standing to sue." *Ohio Pyro, Inc. v. Ohio Dept. of Commerce*, 115 Ohio St.3d 375, 2007-Ohio-5024, 875 N.E.2d 550, ¶ 27. " '[T]he question of standing depends upon whether the party has alleged such a "personal stake in the outcome of the controversy * * *" as to ensure that "the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution." ' " *State ex rel. Dallman v. Franklin Cty. Court of Common Pleas* (1973), 35 Ohio St.2d 176, 178-179, 64 O.O.2d 103, 298 N.E.2d 515, quoting *Sierra Club v. Morton* (1972), 405 U.S. 727, 732, 92 S.Ct. 1361, 31 L.Ed.2d 636, quoting *Baker v. Carr* (1962), 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663, and *Flast v. Cohen* (1968), 392 U.S. 83, 101, 88 S.Ct. 1942, 20 L.Ed.2d 947.

**{¶ 12}** "[A]n association has standing on behalf of its members when '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.' " *Ohio Contractors Assn. v. Bicking* (1994), 71 Ohio St.3d 318, 320, 643 N.E.2d 1088, quoting *Hunt v. Washington State Apple Advertising Comm.* (1977), 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383; see also *Ohio Hosp. Assn. v. Community Mut. Ins. Co.* (1987), 31 Ohio St.3d 215, 218, 31 OBR 411, 509 N.E.2d 1263. We have emphasized that "to have standing, the association must establish that its members have suffered actual injury." *Bicking*, 71 Ohio St.3d at 320. At least one of the members of the association must be actually injured. See, e.g., *Warth v. Seldin* (1975), 422 U.S.

4

490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343; *Ohio Licensed Beverage Assn. v. Ohio Dept. of Health*, Franklin App. No. 07AP-490, 2007-Ohio-7147, ¶ 21. "[T]he injury must be concrete and not simply abstract or suspected." *Bicking* at 320.

{¶ 13} ASA and ASA-Ohio claim that their members have been injured in two distinct ways caused by the lack of a bond provided by Turner on the project: (1) lost business opportunity for those members who decline to provide labor and material for the project and (2) increased risk of loss and potential default in other areas of business for those members who provide labor and material for the project without the guarantee of payment under a bond.

{¶ 14} They have not supported these claims, however, with any credible evidence. All subcontractors working on the project have been timely paid. No subcontractor working on the project has complained to Ohio State or Turner about the lack of a bond, and the bidding for work on the project by subcontractors has been at the expected level. The evidence shows that Turner has finished many construction projects for Ohio State and has completed many of them without a surety bond, and the construction-manager-at-risk agreement has multiple safeguards to ensure that subcontractors are timely paid for their performance of services and provision of materials.

{¶ 15} In fact, if Ohio State had requested that Turner furnish a bond, Turner would have required bonds from its subcontractors, which might have inhibited EDGE-certified subcontractors from bidding. See R.C. 123.152(A), defining "EDGE business enterprise" as "a sole proprietorship, association, partnership, corporation, limited liability corporation, or joint venture certified as a participant in the encouraging diversity, growth, and equity program by the director of administrative services under this section of the Revised Code."

{¶ 16} Therefore, ASA and ASA-Ohio have not established that any of their members have been injured by Ohio State's decision not to require Turner to provide a surety bond. At best, they raise an "abstract or suspected" claim rather

than an "actual" or "concrete" one. See *Bicking*, 71 Ohio St.3d at 320, 643 N.E.2d 1088. ASA and ASA-Ohio thus lack standing to raise their mandamus claim.

{¶ 17} Conversely, SFAA has established that at least one of its members is actually injured by the lack of a surety bond provided by Turner. Turner has a multisurety agreement with five companies that have agreed to provide performance and payment bonds to Turner when a bond is required for a project. SFAA is a trade association of these bond companies, and relators have established by affidavit that each of these sureties is a member of SFAA. Ohio State concedes that "these companies stand to lose the profit they would have earned—a handsome profit no doubt—on any bond Ohio State required from Turner."

{¶ 18} Because these SFAA members would otherwise have standing to sue in their own right, because the interests SFAA seeks to protect are germane to its organizational purpose of advancing sureties' interests, and because the individual sureties' participation is not required for this mandamus case, SFAA has established that it possesses the requisite standing to raise the mandamus claim. *Bicking*, 71 Ohio St.3d at 320.

{¶ 19} Therefore, we dismiss ASA's and ASA-Ohio's claims for lack of standing and proceed to address the merits of SFAA's mandamus claim.

*Mandamus*

{¶ 20} SFAA requests a writ of mandamus to compel Ohio State to require Turner to furnish a surety bond for its position as construction manager at risk. To be entitled to the writ, SFAA must establish a clear legal right to the requested relief, a corresponding clear legal duty on the part of Ohio State to provide it, and the lack of an adequate remedy in the ordinary course of the law. *State ex rel. Am. Civ. Liberties Union of Ohio, Inc. v. Cuyahoga Cty. Bd. of Commrs.*, 128 Ohio St.3d 256, 2011-Ohio-625, 943 N.E.2d 553, ¶ 22.

{¶ 21} SFAA bases its entitlement to the writ on Section 8 of H.B. 318 and R.C. 153.54. Section 8(A) of H.B. 318 states, "During fiscal year 2010, the Chancellor of the Ohio Board of Regents, in consultation with representatives of state institutions of higher education and with Controlling Board approval, shall designate one construction project at each of three different state institutions of higher education as a Construction Reform Demonstration Project that may utilize alternative methods of construction delivery in accordance with this section." Under Section 8(C)(1)(a), one of the authorized alternative methods of construction delivery is to develop the project using a construction manager at risk:

{¶ 22} "For purposes of this section, 'construction manager at risk' means a person with substantial discretion and authority to plan, coordinate, manage, direct, and construct all phases of a project for the construction, demolition, alteration, repair, or reconstruction of any public building, structure, or other improvement and who provides the state institution of higher education a guaranteed maximum price utilizing an open book pricing method, wherein the construction manager at risk provides the state institution of higher education all books, records, documents, and other data in its possession related to itself, its subcontractors, and material suppliers pertaining to the bidding, pricing, or performance of a construction management contract. The construction manager at risk shall be selected using a qualifications based selection process, including best value criteria. 'Best value criteria' includes technical design, technical approach, quality of proposed personnel, management plan, or other factors that are determined to derive or offer the greatest value to the state institution of higher education."

{¶ 23} Pursuant to Section 8 of H.B. 318, certain core phases of ProjectOne were designated as a Construction Reform Demonstration Project, and

Ohio State used the required qualifications-based selections process to choose Turner as the construction manager at risk on the project. Section 8(C)(2) states:

**{¶ 24}** "In developing their Construction Demonstration Reform Projects, the state institutions of higher education are not exempt from the applicable provisions of law concerning any of the following:

**{¶ 25}** "* * *

**{¶ 26}** "(b) Bonding."

**{¶ 27}** SFAA claims that R.C. 153.54 is a bonding provision that is applicable to Construction Reform Demonstration Projects like ProjectOne. R.C. 153.54 provides:

**{¶ 28}** "(A) *Each person bidding for a contract with the state or* any political subdivision, district, *institution*, or other agency *thereof*, excluding therefrom the department of transportation, *for any public improvement shall file with the bid, a bid guaranty in the form of* either:

**{¶ 29}** "(1) *A bond* in accordance with division (B) of this section for the full amount of the bid;

**{¶ 30}** "(2) A certified check, cashier's check, or letter of credit pursuant to Chapter 1305. of the Revised Code, in accordance with division (C) of this section. * * *

**{¶ 31}** "(B) *A bid guaranty filed pursuant to division (A)(1) of this section shall be conditioned to:*

**{¶ 32}** "(1) Provide that, if the bid is accepted, the bidder, after the awarding or the recommendation for the award of the contract, whichever the contracting authority designates, will enter into a proper contract in accordance with the bid, plans, details, specifications, and bills of material. * * *

**{¶ 33}** "* * *

**{¶ 34}** "(C)(1) *A bid guaranty filed pursuant to division (A)(2) of this section shall be conditioned to provide that if the bid is accepted, the bidder*, after

8

the awarding or the recommendation for the award of the contract, whichever the contracting authority designates, *will enter into a proper contract* in accordance with the bid, plans, details, specifications, and bills of material. * * *

**{¶ 35}** "*If the bidder enters into the contract, the bidder, at the time the contract is entered to* [sic]*, shall file a bond for the amount of the contract* to indemnify the state, political subdivision, district, institution, or agency against all damage suffered by failure to perform the contract according to its provisions and in accordance with the plans, details, specifications, and bills of material therefor and to pay all lawful claims of subcontractors, material suppliers, and laborers for labor performed or material furnished in carrying forward, performing, or completing the contract * * *.

**{¶ 36}** "(2) A construction manager who enters into a contract pursuant to sections 9.33 to 9.333 of the Revised Code, if required by the public owner at the time the construction manager enters into the contract, shall file a letter of credit pursuant to Chapter 1305. of the Revised Code, bond, certified check, or cashier's check, for the value of the construction management contract to indemnify the state, political subdivision, district, institution, or agency against all damage suffered by the construction manager's failure to perform the contract according to its provisions, and shall agree and assent that this undertaking is for the benefit of the state, political subdivision, district, institution, or agency." (Emphasis added.)

**{¶ 37}** In determining whether R.C. 153.54 is the *applicable* bonding law for Construction Reform Demonstration Projects under Section 8 of H.B. 318, we must read words and phrases in context according to the rules of grammar and common usage, and we may not add words to the statute if it is unambiguous. See *Hudson v. Petrosurance, Inc.*, 127 Ohio St.3d 54, 2010-Ohio-4505, 936 N.E.2d 481, ¶ 30, and cases cited therein.

**{¶ 38}** The plain language of R.C. 153.54(A) specifies that the bonding requirement applies to persons "bidding for a contract * * * for any public

improvement." See R.C. 153.54(A). "Bid" generally means a "submitted price at which one will perform work or supply goods." Black's Law Dictionary (9th Ed.2009) 183.

{¶ 39} But "[u]nder the standard for construing statutes in pari materia, statutes relating to the same subject matter must be construed together to give full effect to the provisions." *State ex rel. Lucas Cty. Republican Party Executive Commt. v. Brunner*, 125 Ohio St.3d 427, 2010-Ohio-1873, 928 N.E.2d 1072, ¶ 14. As used in R.C. Chapter 153, "bidding" on a public-improvement contract is tied to awarding the contract to the "lowest responsive and responsible bidder in accordance with section 9.312 of the Revised Code." R.C. 153.08; see also R.C. 9.312(A). That is, the term "bid" for purposes of R.C. Chapter 153 refers to a selection process for the *lowest responsive and responsible bidder*.

{¶ 40} In fact, although SFAA attempts to argue otherwise in its reply brief, in its initial merit brief, SFAA conceded that H.B. 318 mandated a "*non-bid* method of selecting entities principally responsible for alternative methods of construction delivery." (Emphasis added.) That is, in essence, SFAA admitted that the qualifications-based selection process set forth in H.B. 318 is inapplicable to the bidding requirements of the low-cost selection process of R.C. Chapter 153, including bonding. Its new argument in its reply brief is forbidden. See *Am. Fiber Sys., Inc. v. Levin*, 125 Ohio St.3d 374, 2010-Ohio-1468, 928 N.E.2d 695, ¶ 21.

{¶ 41} Conversely, because there is no bidding as that term is used in R.C. Chapter 153 for the qualifications-based selection of a construction manager at risk under Section 8(C)(1)(a) of H.B. 318, Ohio State was under no duty to require that Turner furnish a bond under R.C. 153.54 because that section is manifestly inapplicable. SFAA's claim that the solitary reference to "bidding" in the construction-manager-at-risk section of H.B. 318 establishes the legislative intent that R.C. 153.54 apply to this alternate construction-delivery method lacks

merit. H.B. 318 merely requires "an open book pricing method, wherein the construction manager at risk provides the state institution of higher education all books, records, documents, and other data in its possession related to itself, its subcontractors, and material suppliers pertaining to the bidding, pricing, *or* performance of a construction management contract." (Emphasis added.) Section 8(C)(1)(a) of H.B. 318. Under the language of this section, bidding—at least in the meaning of the low-cost bidding specified in R.C. Chapter 153—is not required.

{¶ 42} In effect, SFAA's arguments contravene the plain text of the H.B. 318 and R.C. Chapter 153. And regardless of whether R.C. 9.333 is applicable to additionally authorize Ohio State's contractual provision that Turner furnish a letter of credit instead of a bond, neither H.B. 318 nor R.C. 153.54 required that Turner provide a surety bond for its construction-manager-at-risk agreement. We cannot read into this legislation a nonexistent bonding requirement. *State ex rel. Columbia Res. Ltd. v. Lorain Cty. Bd. of Elections,* 111 Ohio St.3d 167, 2006-Ohio-5019, 855 N.E.2d 815, ¶ 32 (court cannot "add a requirement that does not exist in the statute"). In fact, if the purpose of the temporary law was to afford greater flexibility and lower the costs associated with the multiple-prime-contractor method, that purpose is not advanced by adding to that law a requirement that would have increased the cost of ProjectOne by as much as $11.9 million.

{¶ 43} Therefore, SFAA is not entitled to the requested extraordinary relief in mandamus.

## Conclusion

{¶ 44} Based on the foregoing, we dismiss the claims of ASA and ASA-Ohio because they lack standing, and we deny SFAA's mandamus claim.

Judgment accordingly.

O'CONNOR, C.J., and PFEIFER, LUNDBERG STRATTON, O'DONNELL, LANZINGER, and CUPP, JJ., concur.

MCGEE BROWN, J., not participating.

_____

Williams & Petro Co., L.L.C., John J. Petro, Richard A. Williams, and Susan S.R. Petro, for relators.

Michael DeWine, Attorney General, Alexandra T. Schimmer, Solicitor General, and Jon C. Walden and Jerry K. Kasai, Assistant Attorneys General; and Porter, Wright, Morris & Arthur, L.L.P., Kathleen M. Trafford, and Ryan P. Sherman, for respondent.

_____